[Civil No. 4578. Filed October 30, 1944.]

[152 Pac. (2d) 665.]

HERBERT WATSON, Administrator of the Estate of Victor Cortez, Deceased, Appellant, v. SOUTHERN PACIFIC COMPANY, a Corporation, Appellee.

Mr. A. C. Lockwood, Messrs. Cox & Cox, and Mr. Theodore G. McKesson, for Appellant.

Mr. Lawrence L. Howe, of San Francisco, California, for Appellee.

STANFORD, J.—This appeal comes from the Superior Court of Maricopa County by the administrator of the estate of Victor Cortez from a judgment notwithstanding the verdict, the action having been brought by the administrator to recover damages for the death of Victor Cortez resulting from an injury sustained on April 22, 1941, while Cortez was employed by the Southern Pacific Company. Cortez, who was fifty-seven years of age, worked for said company off and on for approximately twenty-three years. Death followed said injury in the St. Joseph's Hospital in Phoenix on April 27, 1941.

The case was tried before a jury, and the record shows that at the close of plaintiff's case appellee moved for an instructed verdict in its favor. The motion was denied, and at the close of all evidence the motion was renewed and again denied. A verdict of $12,500 was returned by the jury. Thereafter the appellee moved for judgment notwithstanding the verdict rendered, and that motion the trial court granted.

The duties of the deceased on that evening were to ice the locomotives and mail cars of defendant's passenger trains No. 43 (westbound), No. 2 (eastbound), and No. 5 (westbound), as they arrived in the depot at Phoenix, Arizona. He had nothing to do with the Pullman cars, chair cars or baggage cars.

At the scene of the accident, which was at what is generally called the "Union Station" at Phoenix, there are five through tracks running east and west lying south of the depot. They are called tracks Nos. 1, 2, 3, 4 and 5 and commencing with No. 1, first south of the depot, run consecutively to No. 5 to the south.

Train No. 5 on Track No. 3 (westbound) arrived at the station at 8:50 P. M., April 22nd, the coaches staying intact during its stay at the station. At 9:05 P. M., train No. 5 resumed its course westward. It is the claim of appellant that as train No. 5 pulled out Cortez had not finished his work and had to leave the train while it was moving; that in so doing he struck his head on some, part of the train and seriously injured himself to the extent that he became semi-conscious and nauseated. Cortez had serviced the locomotive and mail cars on train No. 5 and was thereafter directed to go to one of the two spur tracks lying to the north of the five different tracks and lying also to the east of the depot, and assist in removing some sanitary cans from a private car upon a spur track. The distance from the west end of train No. 5 on track No. 3 to this particular private car

was approximately 900 feet. On his way back he motioned to the one who had directed him to do that work, and then he returned to the immediate place where he did his work on train No. 5.

Train No. 2 arrived next in the yard, coming from the west going east. Cortez had gone in the westerly direction in order to service the front end of train No. 43, which was due to arrive before train No 2. The engine, of course, on train No. 2 was at the east end of the depot tracks instead of the west end. Cortez was seen after he finished servicing the private car, sitting on a cement curb facing south near track No. 3, some minutes before train No. 2 arrived from the west. His body was found under the last car of train No. 2, and the coaches of that train were not disturbed or moved during its stay in Phoenix. Both legs had been run over by the front wheels of the last car of said train No. 2, the same being a Pullman car.

Appellant brings to us three assignments of error, being as follows:

"I. The Court erred in granting the motion of appellee to enter judgment in its favor in accordance with its motion for a directed verdict, for the reason that the judgment in favor of appellant theretofore rendered and entered was never set aside."

"II. The Court erred in sustaining the objection of appellee to the questions asked by appellant of the witness Ernest L. Hicks, who was an admittedly qualified physician, as to the effect of a blow upon the head in rendering the recipient semi-conscious and nauseated, . . . ."

"III. The Court erred in granting the motion of appellee to have judgment entered in accordance with its motion for a directed verdict, for the reason that there is sufficient evidence appearing in the record to sustain the verdict and judgment in favor of appellant."

 In reference to assignment No. 1, the record shows, as stated, a motion by appellee for judgment at the close of plaintiff's case, a motion for judgment at the close of the evidence of the whole case, then following the verdict of the jury, a motion for judgment on the verdict, and the granting of said motion. Following that, a motion for judgment for defendant notwithstanding the verdict and an alternative motion for new trial. Appellant has cited no cases in support of this assignment, and on authority of the case of *Hulbert* v. *All Night & Day Bank*, 29 Cal. App. 765, 157 Pac. 546, 547, cited by the appellee, we must hold that there is no merit by reason of the assignment. The following is quoted from the above entitled cause:

"It appears that prior to the making of findings a judgment was entered in favor of plaintiff; that thereafter findings were made by the court, regularly followed by the entry of another judgment. This fact is also assigned as error. In *Colton L. & W. Co.* v. *Swartz*, 99 Cal. 278, 33 Pac. 878, it is said: " 'There shall be but one judgment in a judgment roll. . . . If two are found therein, the last in point of time is the only one which can be considered as a part thereof. . . . If necessary, therefore, it will be assumed that the former judgment was vacated.' "

 In reference to assignment No. 2, it is necessary that appellant prove that there was a causal connection between the blow on the head, which Cortez received while servicing train No. 5 going west, and his legs being crushed by train No. 2 going east. It is appellant's contention that the effect of such a blow upon the head was such as to cause nausea and unconsciousness, or semi-unconsciousness, so that in the interim that passed between the leaving of train No. 5, going west and train No. 2 going east, which was about thirty-five minutes, Cortez in that condition

performed certain duties heretofore referred to, and in order to show that a person in that condition could perform such duties, expert medical evidence was offered through Dr. Ernest L. Hicks. It occurs to us from the evidence as we have read it and the objections made to the question after submission of the hypothetical question propounded to Dr. Hicks that the main objection to the question was that the effect of such a blow was not a matter for expert testimony but within the common knowledge of mankind. But the appellee contends, among other things, that when the court sustained the objection to the evidence of Dr. Hicks to the hypothetical question, then the appellant failed to make an offer to show what the evidence would be according to Sec. 21–923, Arizona Code Annotated 1939; and in supporting the theory in that respect the transcript of evidence shows that the court told counsel for the appellant the following: "You can argue all you want to, to the jury that this man was knocked unconscious." We believe that the appellant was entitled to show by expert testimony that he was not only knocked unconscious, but that the jury had the right to determine from such expert testimony whether or not he could have done the things he did after the blow on the head and could have brought himself unconsciously in position where he was killed by the last car of train No. 2, for it occurs to us that this is an inference where expert evidence is required.

From Sec. 782, Page 654, 20 Am. Jur., we quote the following:

" . . . It is certainly contrary to the unmistakable trend of authority to exclude expert opinion testimony merely upon the ground that it amounts to an opinion upon ultimate facts. The modern tendency is to make no distinction between evidential and ultimate facts subject to expert opinion. The courts con-

sider that it is more important to get to the truth of the matter than to quibble over distinctions in this regard which are in many cases impracticable. Accordingly, in many cases expert witnesses have been permitted to state facts known to them because of their expert knowledge, even though their statements may involve the ultimate fact to be determined by the jury . . . . ''

 In the case before us the appellant claims that by the conversation between counsel and the court at the time of the ruling on this question that sufficient notice was given as to what the proof would be on that question and it was sufficient to comply with Sec. 21–923, *supra,* which reads in part as follows:

"*Record of excluded evidence.*—In an action tried by a jury, if an objection to a question propounded to a witness is sustained by the court, the examining attorney may make a specific offer of what he expects to prove by the answer of the witness. The court may require the offer to be made out of the hearing of the jury. The court may add such other or further statement as clearly shows the character of the evidence, the form in which it was offered, the objection made, and the ruling thereon. . . . ''

From reading the many pages of the transcript at the time of the offer of the testimony of Dr. Hicks we find that it was obvious to the court what appellant offered to prove by the doctor was that the natural and probable effect of the blow on the head received by deceased as he left train No. 5 was such that it might be reasonably inferred by the jury that deceased was in a semi-conscious and nauseated condition for a period of time thereafter, but the trial court took the position because the evidence of Dr. Hicks, as offered, was one within the knowledge of the jury as reasonable men and that expert evidence was not necessary on the subject.

■■ The question for us to determine under the third assignment is whether from the whole evidence it could be reasonably said that the appellant established negligence on the part of the appellee Railroad Company and had further established that such negligence was the proximate cause of the death of deceased.

The complaint of the appellant alleges that appellee "wrongfully and negligently moved the train, on, around or near which decedent was then and there working while so engaged in the line and scope of his employment, causing same to strike decedent and cut off his legs from which injury he died on said 27 day of April, 1941."

The complaint was never amended to conform to the proof that was adduced at the trial, but we find no objection to that on the part of the appellee.

Bare possibility that the accident happened in the manner as claimed by the appellant in his evidence and in his statements, is insufficient to submit the case for the decision of the jury.

There were three passenger trains expected to arrive on the night of April 22, 1941. There was a westbound train known as No. 43, a westbound train known as No. 5 and an eastbound train known as No. 2, to arrive in the order named, but No. 5 came in first, and its engine and mail cars at the front of the train were serviced by Cortez and No. 5 left at 9:05 P. M. Between that and the next thirty-five minutes Cortez performed the duties heretofore outlined. He was later seen, all according to direct evidence, about 9:15 at the place where the engine and mail cars of No. 43 going west would be and very close to where he serviced No. 5. Instead of No. 43 arriving as the next train, No. 2 (eastbound) arrived at about 9:40 P. M. and it was under the last coach of train No. 2 going east, but in the proximate locality of where he

serviced train No. 5 and expected the engine and mail cars of train No. 43 to be, when he was found lying between the track of the last car of train No. 2.

Proof thus far by the appellant would not show liability of the appellee, but it is the theory of the appellant's case, to be shown by inference, "that he was seen sitting on the curb five minutes before the train came in, that he was not there as it entered the yard and passed the place where he had been sitting on the curb five minutes before, nor was he standing near, but was found lying between the track and the train mutilated by the last car; that for some reason in that interval he must have fallen between the track and the curb in such a position that he was not harmed by the first cars of the train, but that he struggled as the last car passed, so that his legs got under its front wheel and were mutilated."

To complete the charge of appellee with negligence, appellant submitted the statement of deceased's daughter, who called on her father at the time he was first taken to the hospital, and at that time he made to her, in response to a question, this answer:

"I was working. At the time I was coming from the second baggage car. I had two buckets full of ice, one in each hand, then when the train started I felt the blow on my head and I fell down and some body had taken away the blue flag, and that should stay there."

We are brought now to consider assignment No. 2 in further consideration of this third assignment. Appellant offered the testimony of Dr. Hicks, as heretofore stated, and submitted to him a hypothetical question. The question is lengthy, but taking up the latter part of it we quote the following:

"Mr. McKesson: Received a blow on his head on said day, in the nighttime, received a blow on his head from a starting train while he was descending from

said train with ice buckets in each hand, with an ice bucket in each hand, and that he fell. Now, Doctor, could this man Victor Cortez, in your opinion, have probably been rendered in such a semi-conscious state that without having any conscious knowledge of what he was doing, have in the line of his employment walked approximately 900 feet from the point where he fell, and removed a sanitary can from a private car on a railroad spur, and then walked back approximately 900 feet and waved his hand at another employee of the Company on his way back, and then at about nine-thirty-five, P. M., have been standing on a platform, and at approximately that time, or a few minutes later, took three steps to the edge of a platform and sat down, in your opinion, could a man probably have been in such a semi-conscious state, assuming those other facts, that he might have done that?"

To that question the counsel for appellee objected and the objection was sustained although the question was several times reframed. After a verdict had been rendered by the jury, and the judgment of the court granted on the verdict, the appellee filed his "motion for judgment for defendant notwithstanding the verdict, and alternative motion for new trial." And from that motion we quote the second ground submitted by appellee:

"(2) The evidence is insufficient to sustain a cause of action in favor of the plaintiff and is insufficient to support the verdict, and the judgment and the verdict are not justified by the evidence and are contrary to law."

It is obvious, therefore, that the motion for judgment notwithstanding the verdict was granted on the grounds that the appellee objected to being shown, that is the evidence referred to in the hypothetical question. The trial court told appellant that he could argue before the jury the matter he attempted to prove by Dr. Hicks and while the counsel for appel-

lant· may have argued such that nevertheless could not supply the testimony.

We feel that the testimony should have been allowed and accordingly the case is reversed and remanded for new trial.

McALISTER, C. J., and ROSS, J., concur.